Good morning, Your Honors. May it please the Court. My name is Glenn Herra. I represent the plaintiffs, True Health Chiropractic and McLaughlin Chiropractic Associates. I'd like to try to reserve five minutes of my time for rebuttal, if I can. The clock counts now. Great. Well, Your Honors, we're here on interlocutory review of the District Court's denial of class certification in this TCPA case. It involves about 70,000 fax transmissions. We contend that they were advertisements in violation of the Telephone Consumer Protection Act. These cases are regularly certified as class actions under Rule 23b-3. We cite multiple cases where nearly identical cases have been affirmed by the Seventh Circuit or denials have been reversed by the Eighth Circuit and Sixth Circuit. There are really only two circumstances where we run into a problem certifying these cases. One is we're lacking the fax transmission logs, so we can't tell which fax numbers successfully received the fax. That's not a problem in this case because we subpoenaed the third-party fax broadcaster who actually transmitted the faxes, a company called Slingshot, and those records show which numbers successfully received the faxes. And as I gather, there's no serious dispute that there are 11,000 unchanged fax numbers to which these faxes were transmitted. That's correct, Your Honor. That's what our expert concluded, and the defendant's expert, Mr. Sponsler, doesn't dispute that number, the 11,979. Nevertheless, the defendants did argue their main argument below against class certification was ascertainability, and that was before this Court's decision in Briseno v. Conagra earlier this year, which rejected the heightened ascertainability standard that the Third Circuit applies in class action. So the defendants don't argue that in their brief. I'm not going to spend a lot of time on it unless the Court has other questions about ascertainability. I do have one question that doesn't have to do with ascertainability. In light of the D.C. Circuit's ruling, are you dropping your claim with regard to the failure to include an opt-out notice on the bottom? No, absolutely not, Your Honor, and there's two reasons. I guess my question is what's the impact of that decision on the case? That's a fair question, and that decision came down after the District Court's ruling. I understood. I'm just trying to figure out what's left here because I'm reading the case law as saying that once the D.C. Circuit resolves that issue, then it's binding nationwide. Right. We disagree with that completely, and I can understand why reading the D.C. Circuit's opinion. You disagree with the nationwide application of the D.C. Circuit's ruling? Correct. Well, yes, I do, because the D.C. Circuit's opinion is very cursory, and it leaves out a lot of the history of how that dispute got to the D.C. Circuit.  Well, I'll explain. It's because the FCC order that was on appeal in Baez-Yakov, that's the name of the D.C. Circuit case, was the October 30, 2014 order of the FCC. That order was issued eight years after the regulation was issued, and an attack on the 2006 regulation was time barred by that point. You couldn't go into the FCC and appeal it in the Hobbs Act procedure, and that's what the FCC ruled, and the D.C. Circuit didn't reverse that and didn't disagree. But the argument that you're making to us here is as to the merits of the D.C. Circuit's ruling. You still haven't addressed my concern, which is even if they're wrong, at this point isn't their decision binding on all the other circuits as a result of the statute? It's not, Your Honor. And I'm not arguing, I'm not trying to convince this Court that the D.C. Circuit was wrong, although I believe it was in our petition. No, I think you are trying to convince us that it was wrong. No, I'm talking about the nature of that decision and what order it was that was vacated and remanded for further proceedings to the FCC. That FCC order, the 2014 FCC order, dismissed all of the petitions that sought a declaratory ruling that the regulation was invalid as time barred. It addressed the only timely petition, which was the Staples petition to repeal the rule prospectively on the merits. The D.C. Circuit didn't touch any of that. And the FCC, before the D.C. Circuit, said, the only reason this issue of the validity of the regulation is even live before this Court is because Staples petitioned to repeal it going forward. But I thought the issue in that case was it was apparently confusing in light of the FCC's original regulation as to whether it applied to companies that had existing business relationships with the transmitter of the facts. And the business community didn't know because it wasn't clear. Then the agency started issuing retroactive approvals of exceptions to the application of the rule, right? I have to clarify that a little because the confusion wasn't about whether you need an opt-out notice on a fact sent with an established business relationship. Everyone agrees, and the FCC agrees, that that rule is clear. That's in the statute. You need that. That's not imposed by regulation. What the confusion the FCC ruled was was about whether you need an opt-out notice on a fact that's sent with prior express invitation or permission, which is a much higher standard than just having an EBR with somebody. An EBR is any two-way communication between two people. You don't even have to buy something from the company. You just inquire about the product. It creates an EBR. And the statute says in that circumstance, where there is an EBR and where the customer voluntarily provides their fax number to the sender, and, three, there is a compliant opt-out notice on the fax informing the recipient how to effectively revoke that implied permission to send faxes, send fax ads, then the sender falls into that safe harbor, okay? So the retroactive waivers in the FCC order said this waiver does not apply to the EBR exception because that's clear and everybody understands that. And, really, what we tried to show in our briefs is that this is the classic EBR situation. This is exactly the situation that Congress contemplated in 2005 in the Junk Fax Prevention Act of 2005. Congress wanted to make an exception so that companies could send fax ads to their customers who had voluntarily provided their fax numbers as long as they provide a compliant opt-out notice. Defendants' faxes have no opt-out notice whatsoever. It's not even that it's arguable whether it complies or not, which is the case in many cases. There's just no opt-out notice at all. Can we move on to another topic? Certainly. Assuming that you lose on that one, I do not ask you to concede, but assuming that that's not a winner for you, what I'm interested in is the three possible subclasses for which I think you're arguing. And I think you're arguing that the first subclass is Exhibit A minus those listed in Exhibits B and C, Exhibit B, and then Exhibit C. Is that roughly right in terms of the subclasses you think we should be looking at? I would think my first argument would be we can do Exhibit A, that's everybody, all 11,979, because the defendants say everybody gave prior express permission in a software registration statement. And if they're wrong on that, then they've got a separate argument for those in Exhibit B. Right. So if they're wrong on that, we have to move to Exhibit B. So we can get a definitive answer one way or the other with respect to Exhibit A minus B and C. Right. And if they're wrong on that, they lose on that end. Correct. Then for Exhibit B, we've got the additional defenses that they claim are available, but I can't find out much about in the record that I've got in front of me. And then finally, Exhibit C is the 55 for which they say, well, there's individual correspondence or communication. Correct. And Exhibit C is 55. That's like 0.4 percent of the class we can exclude. I suspect you don't care very much about Exhibit C. Well, yeah, I mean, we care about them, but if we have to exclude them to save the other 11,700, you'll give it up. Of course. And the same, you know, and the alternative goes for Exhibit B. If the Court determined that Exhibit B is other methods, the defendants claim that these people, 2,700, about 22 percent of the class, gave permission through other methods, which include like a consent form, which we've never seen and I don't know what the consent form says, or. I guess this is for the other side. Why have we never seen that? I mean, if that's their defense and we know from Van Patten that it's their defense to bring forward, why has that never shown up, despite all the wrangles about discovery? I don't know, Your Honor. What they were ordered to do in the order granting sanctions, Magistrate Judge Reeves' order sanctioning the defendants, was to break it down by category, which they said they could do. The defendants said we can give you by category. And what they were to do was identify each recipient that's in each category and produce an example. They didn't have to produce software registration forms for 12,000 people. They could just give us an example of what the form was, which they've done for the software registration forms. And by the way, they say nothing about receiving fax advertisements. But for Exhibit B, I don't have those documents. We have declarations from two employees of the defendants who say, oh, yeah, we got permission all the time. People would tell me on the phone that they would like me to send them fax ads, you know. So given that it's their burden of proof to prove the prior express permission defense, what we're urging the court to hold is a defendant can't tip the scales against class certification by speculating that some people may have given permission through oral or e-mail communications or that they may have signed a consent form, which we don't even know what the consent form says. And the Sixth Circuit's decision in bridging communities, which we rely on in our brief, is right on point with that. Is this case factually closer to bridging communities or the gene and gene bioplay case? As to the class members for whom they produced no documentation? Just in general terms, my understanding is bridging communities is a case where a company that was going to send out these faxes simply bought a list of telephone numbers, made no effort to determine consent or acceptance, and sent out blast faxes. Is that correct? That's correct. They hired a third-party marketer. Gene and gene is different, isn't it? Gene and gene, that was before my time, and the opinion's not real clear on what happened, but I believe the defendant was sending them in-house, sending the faxes in-house, and didn't hire a third-party broadcaster like the defendants in this case did. So in that respect, it's further away. It's not a third-party marketer case like bridging communities was, but it's also not like gene and gene or the Sixth Circuit. Again, I don't know exactly what the record was in gene and gene, but like the Sixth Circuit case in Sandusky Wellness versus ASD, which the defendants rely upon. I'm curious to know what you mean by before my time. Sorry. It's before I started doing TCPA litigation. It wasn't one of my cases. Most of these cases are my firm's cases, so I can talk in greater detail about the record. My firm does more of these fax cases than anyone else in the country. But in Sandusky Wellness versus ASD, the defendant produced like 460,000 pages of consent-related documents, all these different forms that they'd gathered over like 20 years. Some of them were actually really good and said were better than anything I've ever seen, said I understand that the TCPA requires prior express permission to send fax advertisements and here's my fax number and you can send me fax ads. There's nothing like that in this case. There's these software registration forms and end-user licenses agreements, which really just show an EBR. And now that the defendants can't satisfy the EBR safe harbor because they have no opt-out notice, they're trying to fit a square peg into a round hole and say, we can't meet the lower relaxed standard that Congress created for exactly this situation, so we're going to try to fit it into the higher standard of prior express invitation or permission in order to try to undo class certification or avoid class certification, which is all they're really concerned about, frankly. I'm going to reserve two minutes if I can, Your Honor. Thank you. Fine. Let's hear from the other side. Thank you, Your Honor. I'm Joseph Palmore here on behalf of McKesson. The district court did not abuse its discretion in denying class certification. The court correctly concluded that individualized inquiries into consent would overwhelm common issues in this case. What about the class that I will describe as Exhibit A minus Exhibit B and C? Your Honor, that would replace 11,000 mini-trials with 9,000 mini-trials. Well, why would that be? Because it sounds as though the only defense you have is two forms that clicked on and they're uniform as to every member of that subclass. No, that's not correct, Your Honor. We have multiple overlapping forms of consent. No, as I read what I've got in front of me, there are three exhibits, A, B, and C. Correct. Exhibit A is all 11,000. Correct. And as to those, you say, well, they've clicked on some sort of a usage, a two-click on sort of here's my fax number. Right, they voluntarily gave their fax number. And I've read those. I gather that's uniform for all 11,000. Correct. Your Honor, as to Exhibit B, you have an additional defense. And if I subtract Exhibit B and Exhibit C from Exhibit A, the only defense you have as to those 9,000 or so is those two forms that I've just read in the record. Isn't that right? Respectfully, Your Honor, that's not right. Why is that wrong? Because it seemed to me that that was crystal clear. Your Honor, if you look at pages, excerpts of record 6 to 7, this is where the district court reviewed this. And, of course, this is up here on abusive discretion. I read the district court, but I'm talking about what's in the record, not what the district court said. The district court was citing the record. It was citing our supplemental interrogatory responses. It was citing the Paul Declaration and the Holloway Deposition. And in all of that material, what McKesson said was that there were multiple instances of verbal consent, and they were not always recorded in the Salesforce database, which is the basis for Exhibits B and C. I think it's important to take a step back and look at the larger context here. So are you saying that the software registration form doesn't address consent? It does, Your Honor. It is a common question, as the district court recognized. What language would you point me to in the software registration statement? Because I didn't see anything that said anything about consenting to receive faxes. It doesn't, Your Honor. Of course, that's a merits question, which is not directly at issue here, but I'm happy to answer it. Under this court's decision in Van Patten from earlier this year, the court held that on the phone call side of the TCPA, voluntarily giving a phone number in the context of a commercial transaction constitutes consent to be contacted at that phone number on subjects that are material to that same transaction. So, too, here. And this goes to the point I was – So we apply or infer consent from the fact that each customer supplied their fax number? Yes, which they didn't have to do. They were purchasing software. This goes to the contextual point that I think is critical for the court to understand. All of these faxes went to existing McKesson customers. This is not a case, like the court sees sometimes, of someone purchasing a list of fax numbers and then blast faxing ads for timeshares or something like this. All of these people were existing McKesson customers. They had bought practice management software, and then the communications were relevant to upgrades and other things related to that software. Moreover, there were – So why couldn't the district court certify that subclass and decide that question, whether or not the submission of the fax number to McKesson is sufficient to establish consent to receive advertisements at that number? Because, Your Honor, there are other forms of consent that are at issue here. And what the Supreme Court said in Amgen is a question is susceptible to class certification if you're going to get a yes or no answer that is going to decide the question for the class as a whole. Well, if the answer is yes, you win. If the answer is yes, you win. If the answer is no, then I guess what you're telling me is that your fallback defense is there is consent that can be established some other way, such as verbally or by email. Absolutely, on a customer-by-customer, sales rep-by-sales rep basis. And did you produce all of that discovery in response to the district court's order? Well, we certainly didn't do that investigation and produce 11,000 examples of these kinds of conversations. But we said in our supplemental interrogatory responses, based on deposition testimony and a sworn declaration, that these conversations happened all the time. These sales reps were on the phone with their customers. They were visiting their customers. The undisputed evidence in the record shows that customers frequently ask for information to be sent by fax. I guess the question is, is that enough at this point, or is that too speculative under our case law to establish consent? Your Honor, it's not at all speculative. It is concrete, sworn evidence that the district court relied on. And, of course, this is here on an abuse of discretion standard. And what the district court said at page 7 of excerpts of record was, McKesson can show, if required to, could go through and go on a customer-by-customer basis, on a sales rep-by-sales rep basis, asking about conversations and establish consent for many of these individuals. There's no rule that requires that incredibly onerous investigation to be done in advance of class certification. The whole point of class certification is to see if there's a common question with a common answer that will drive. Let me ask the question in a different way. Aside from, was it the Hall declaration that you referenced? The Hall, Holloway. There's a Hall declaration and there's a Holloway deposition. Hall and Holloway? Correct. So, aside from veering generally that there were other forms of consent, are there any examples of a specific customer or a specific, I'll call them a detail man because I'm not sure what you would, sales rep conversation with a specific customer saying, on such and such an occasion, this customer orally provided consent? Your Honor, I don't think that we have that at that level of granularity and I don't think that that's required. What we have is Paul. So, what we have is a general statement that there is out there in the world that could be discovered perhaps through the testimony of these sales reps, individual conversations on a customer-by-customer basis. Your Honor, we have Jeffrey Paul said, and the district court relied on this in excerpts of record seven, explained that he would have, quote, numerous conversations with customers over the phone on a daily basis and that it was commonplace for customers to ask him to send them information by fax, including information on promotions. And how does he know that? Is that from his personal knowledge? Absolutely. He was a sales representative. And then Ms. Holloway, she supervised a team of sales representatives. In fact, some of the faxes at issue here were signed by Ms. Holloway. So, she was very familiar with the work of the people that she was supervising. And she said that customers, and this is again quoted at ER seven, customers would request a lot of information via fax, that she and other sales members would send faxes either in bulk or one by one. And she explained that they would send faxes to existing customers based on their communications with each fax recipient. This is very concrete, specific evidence. Sure enough, we didn't go through and provide a file for all 11,000 recipients, but there's no obligation. Now, do these that you've just described fall in Exhibit C? Your Honor, in those cases where there was a contemporaneous notation in the Salesforce database, those are in Exhibit C. But what the evidence shows is that in many cases it wasn't noted there. Keep in mind, again, the context. These are sales representatives. They're in the field. They're selling upgrades. They're talking about products. These aren't people who write a memo to the file every time they have a conversation with a customer. So in many cases, and that's Exhibit C, and in some cases Exhibit B, these were noted in the Salesforce database. But in many cases they weren't, and there's no requirement that they be noted. So to produce the requirement under Van Patten, because I think the Van Patten telephone call affirmative defense idea will apply here for faxes, it's your defense. Absolutely. It is our defense, Your Honor. And I'm troubled by the district court not asking to see actually, for example, you claim for Exhibit B, well, there was a possibility of checking the box. I've never seen that box. I mean, what's it look like? What's the context? If there is such a box, why didn't you hand it to the district court? I mean, it's your obligation to present that as a defense. Your Honor, what the district court asked for were categories of consent, and that's absolutely what we provided. What the plaintiff asked for in discovery was let me see the box, and as far as I can tell it never showed up. Why not? No, Your Honor, I don't think that they never asked to see the box as far as I know, and in any event, the district court. Okay, let me ask it a different way. If this were to go to trial, would you be obliged to show the box if that's the basis upon which you claim that there's been consent? If the records were retained, then yes, I think we would be. But, Your Honor. And if the records weren't retained, you have no defense. I disagree, Your Honor, because there is a. Then what is the defense? If you don't have the box, what is the defense going to be? There's a notation in the database that the box was checked. But the box is really a side issue. The critical point. But what is the box? I mean, what surrounds it? I mean, it says check the box, but what's the line above it that says check the box if? Do you know that? Right. That's not at that. The form is not in the record. I readily concede that, Your Honor. I'm asking you, do you know what it is? I don't know. I don't know, Your Honor. And why don't you know? Because it's not in the record, Your Honor. It's not in the record. But the critical point for the district court. Are you claiming your client doesn't know? Your Honor, not all of these records were retained. This was 7 years ago. But the database shows various forms. I'm asking you, are you saying that your client does not know what that box is? Your Honor, I don't believe that we have those records anymore. At least we were not able to locate them at this stage of the case. But that's not what we were asked for. We were asked to provide categories of consent, and that's exactly what we did. But the driver for the district court was not the box, was not the consent forms. It was the oral conversations. Judge Hawkins, you asked about Gene & Gene. This case is almost exactly like Gene & Gene. Gene & Gene was a case where the sender actually purchased a list of fax numbers. That's something we did. We got our fax numbers from our own customers, so we're actually better off than that entity. But then there were other forms of consent through the website, through trade shows. And that sender also didn't retain all of the records. It didn't keep records of those other forms of consent. But it said, if put to the test, if we have to advance our defenses, we would be able to do that. And there would be a series of mini-trials. In that case, the district court actually certified the class, and the Fifth Circuit concluded it was an abuse of discretion to do so in the face of that individualized evidence. Likewise, in Sandusky Wellness Center, the Sixth Circuit case that was the subject of our 28J letter, the same argument was made about the validity of the D.C. Circuit's ruling, and then the same argument was made about subclasses as a backup. And the court there said, no, because there's individualized evidence of consent. This consent can't be decided, yay or nay, on a class-wide basis. It's exactly the same here. But I think the D.C. Circuit's decision really is critical, because from the beginning, plaintiffs built this case around the FCC's opt-out notice regulation. That's what they alleged in their complaint. That was the basis for class certification, the motion. They said, don't worry about consent. That's not going to create individualized issues, because these faxes didn't include opt-out notices, and they relied for that solely on the FCC regulation. That FCC regulation is gone now. The D.C. Circuit held that it was unlawful. Judge Tallman, you started off with this line of questions, and I think the best evidence of what the D.C. Circuit did is what it said. At page 1079, and again at page 1083, the D.C. Circuit said, we hold that the FCC's 2006 solicited fax rule is therefore unlawful to the extent that it requires opt-out notices on solicited faxes. Are you going with this, where you went in your brief, to say that the plaintiffs have waived any argument for subclasses? Back on the subclass issue, absolutely, Your Honor. They have waived the argument for subclasses. Why is that so? Because as I read the papers they filed in the district court, ER 118, they specifically address subclasses. And as I read the transcript of the hearing in front of the district court, there's a specific discussion of subclasses. How can that have been waived? What we said in our brief, Your Honor, which is absolutely correct, is that the argument they made for subclasses initially was they said, let's have a subclass of people who consented and a subclass of pure unconsented-to faxes. That was their original proposal. At the hearing, Your Honor is absolutely right that the district court itself, sua sponte, brought up this suggestion in passing of, why don't we do subclasses based on A, B, and C? Well, I'm not sure it was in passing. It occupied several, quite a few pages. There was discussion of it, to be sure. But then the district court asked for supplemental briefing on something entirely different, actually kind of the Van Patten question about who bears the burden on consent. And if you search the plaintiff's supplemental brief, the word subclass does not appear. But that's not the question that was asked. The question was asked under Van Patten. Right, Your Honor. But if a party wants subclasses, they've got to make the showing. They've got to establish the 23A and the 23B3 requirements for the subclasses. Most obviously, they have to show they have a named plaintiff in each subclass. And that's something that they never showed here. They didn't. Well, that question hasn't been reached. Is that right? No, it wasn't reached. The district court didn't address it because it was never properly asked for. But putting the waiver aside, the subclasses, yes. Let me ask you a different question. A bit earlier, you suggested that the standard for consent in the Van Patten case with cell phones is the same as the standard here. Is that right? It is a call case, as I said. But I think the FCC's decisions and the case law pretty typically cite interchangeably calls and faxes. But I don't have authority of a decision from this Court applying Van Patten in a fax context. That's right. But the statutory standard is different. Well, no. It uses the prior express invitation, prior express consent. I think they're interchangeable. The FCC has often treated them as interchangeable. And it stands to reason, again, when you're buying a piece of software, there's an optional box for you to put in your fax. And you put that number in. The only possible purpose for putting that number in is to receive faxes from the seller. So, Your Honor, we believe that the district court did not abuse its discretion. The case for class certification has, if anything, become weaker over time because of the D.C. Circuit's decision. Before you sit down, I want to make sure I understand which box we're talking about. Is the box the field for inputting your facsimile number? Yes, Your Honor. That's the Exhibit A. And once that was done, then McKesson recorded the information from that box, the fax number, in its own internal customer databases? Absolutely. And then sent those customers information relevant to the product that they had purchased. But there was consent given, as I said, in many other ways as well. Now, is that box the same box that you're referring to with respect to Exhibit B? No, Your Honor. The Exhibit A box is a box where the fax number is filled in. Okay. You've saved some time. Your Honors, I think I should start where counsel left off, at the different standards for prior express invitation or permission to send faxes and prior express consent to phone calls. The FCC has ruled for 25 years that those are very different standards. Okay? The standard for faxes is much higher. So I don't know if I need to go into that or not. I've read the case law. Okay. Very well, Your Honor. I also have to clarify one other thing. Throughout this year-long epic discovery battle that we had with the defendants over trying to compel their evidence of prior express permission, which they refused to supply to us, at first they said, we'll only give it to you for the plaintiffs because anything else would be irrelevant because no class has been certified. And we said, we can't get a class certified unless you give us the evidence that you're claiming for your defense. And it took a year to undo that, and it led up to a sanctions order from Magistrate Judge Ryu. But the defendants' position was, the compromise they finally offered was, we'll give you our categories of permission and we'll give you the number of recipients in each category, but we won't give you their names or contact information or anything like that because you unscrupulous plaintiffs' attorneys might do something untoward with it. You might try to contact those class members and seed testimony in their minds about, you know, to poison the case against us. So Magistrate Judge Ryu rejected that as meritless. The defendants appealed to Judge Tiger and he rejected it as meritless. Is that what the Magistrate Judge said, that it was meritless? Yes. Used those words? She said, well, she said, it's relevant and your objection is overruled. She may not have used the word meritless. That's a little different. Go ahead with your argument. Okay. And then after Judge Tiger rejected the objections, still the defendants refused to comply. We moved for sanctions and Magistrate Judge Ryu laid down the law and said, look, you're going to break down the categories of permission and you're going to identify each recipient, as you said you could, who falls into each category. Then McKesson got new attorneys and they changed their strategy. And in their supplemental interrogatory, when they were finally forced to file one, they said, well, here's Exhibit A, Exhibit B, Exhibit C, but anyone from Exhibit A may be in Exhibit B and may be in Exhibit C, but the limitations of our recordkeeping won't allow us to tell you that. So one of the questions here is, are we going to allow the defendants to do a 180 like that after we fought it out in the district court for so long on that? And I think the answer is no, especially when you combine it with the fact that it's their burden of proof to show it by clear and convincing evidence, by the way, the FCC's 2006 order says that they obtained prior express permission from recipients. What's your response to counsel's representation of the D.C. Circuit ruling as it invalidated the 2006 order? It couldn't invalidate the 2006 order because an appeal from that order was time barred for eight years by that point. It vacated the 2014 order. Now you're arguing merits again, but doesn't the opinion say that that 2006 order is invalid? It does. That's the rationale, but the holding is the October 2014 order is vacated and remanded to the FCC for further proceedings. What the FCC has to do now is If the 2006 order is invalid, then there was no legal requirement from 2006 forward to include the opt-out notice on the first page of the fact. The Hobbs Act has a strict 60-day jurisdictional limitation for an appeal from a final FCC order. That was the basis of the denial. Okay, suppose you lose on that argument, and at this point the D.C. Circuit opinion invalidates it from 2006 forward. So how do you win on the opt-out argument? That's what's puzzling me. Other than to keep telling me, well, they were untimely. I mean, it didn't seem to bother the D.C. Circuit, but that is the ruling, is it not? No, it's actually, that language is in there, but the effect of that decision, this court has to determine independently. So they said it, but they didn't mean it? Is that your argument? You have to look at what the order on appeal that was vacated and remanded for further proceedings. If the D.C. Circuit opinion says, I mean, maybe we're arguing dicta versus holding in the case, and I don't want to go down that rabbit hole, but maybe that's what we're doing. Well, my question is why would the D.C. Circuit remand for further proceedings? Well, because the agency may very well decide to enact a new rule on a going-forward basis that would not apply retroactively. I suggest the more likely scenario is that they remanded so the FCC could open a rulemaking to repeal the regulation prospectively, which is in line with what the FCC's interpretation was. I am out of time. I would like to raise one possibility, if you do have questions about that. I don't have any more questions. I'm fine. Thank you. Thank you, Your Honors. Thank both sides for their arguments. True Health Chiropractic v. McKesson submitted for decision. The next case on the calendar this morning, Fox v. Vision Service Plan.
judges: Hawkins, W. Fletcher, Tallman